# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
April 3, 2003 Session

## DOUG LONG v. T. ALLEN PANNELL, Jr., ET AL.

### Appeal from the Chancery Court for Knox County
#### No. 147634-3    Sharon Bell, Chancellor

### FILED MAY 30, 2003

### No. E-2002-01792-COA-R3-CV

Doug Long ("Long") and T. Allen Pannell ("Pannell") began operating Volunteer Beauty Supply as a general partnership in 1996. Pannell claims Long orally agreed to be responsible for one-half of the partnership debts. On June 3, 1997, a Certificate of Domestic Limited Partnership was issued by the State for Volunteer Beauty Supply, L.P. The business never made a profit and incurred rather substantial debts. In an unsuccessful attempt to resolve a dispute over payment of these debts, Pannell and Long deposited certain funds into a joint bank account. Long eventually filed a declaratory judgment action seeking a determination that he was entitled to over $100,000 remaining in this account. Pannell filed a counterclaim seeking contribution from Long for partnership debts, but no mention was made of the alleged oral agreement. The Trial Court refused to grant Pannell relief for an alleged breach of oral contract because that claim was not pled. The Trial Court did, however, award a judgment against Long for $19,922.52 under general partnership contribution principles, after first concluding Long was entitled to the funds in the joint account. Both parties appeal. We affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of
### the Chancery Court Affirmed; Case Remanded.

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HOUSTON M. GODDARD, P.J., and HERSCHEL P. FRANKS, J., joined.

Dan D. Rhea and Jay W. Mader, Knoxville, Tennessee, for the Appellants T. Allen Pannell, Jr., and Volunteer Ventures, L.L.C.

George W. Morton, Jr., and J. Myers Morton, Knoxville, Tennessee, for the Appellee Doug Long.

# OPINION

## Background

Long and Pannell became friends in the second grade. As adults, they took a road trip to Florida to watch the Tennessee Vols in a post-season bowl game. While in Florida, they jointly purchased a winning lottery ticket. They then went into business together. The business eventually failed, culminating in this lawsuit and, presumably, the end of their long friendship.

This lawsuit started as a declaratory judgment action filed by Long against Pannell wherein Long sought a declaration that he was entitled to $101,500 then in a bank account. Long and Pannell were joint signatories on this account. Pannell responded by denying Long was entitled to these funds and claiming both parties had made deposits into the account. Pannell also claimed Long was indebted to him in an amount exceeding that which was on deposit pursuant to the "equitable remedy of contribution."

Pannell filed a counterclaim, alleging that he and Long participated in a business known as Volunteer Beauty Supply, L.P. ("Volunteer Supply"), a limited partnership consisting of two general partners and three limited partners. The two general partners were Volunteer Investors, L.L.C., ("Investors") and Volunteer Ventures, L.L.C. ("Ventures"). The three limited partners were Long (who was the majority owner of Investors), Pannell (who was the majority owner of Ventures), and Jack Wetterer. According to Pannell, Volunteer Supply essentially was defunct and Long refused to contribute adequate funds to the partnership or otherwise participate in concluding the partnership's affairs. Pannell claimed to have contributed and loaned money to the partnership in an amount exceeding $400,000. Pannell sought reimbursement from Long in an amount "equal to a pro rata share of monies loaned and/or contributed" by him to the "partnership or the partners as well as for such amounts used to retire indebtedness of the partnership or partners." In response to the counterclaim, Long denied any liability and maintained he was only a limited partner in Volunteer Supply and had no duty to the partnership, financial or otherwise.[1]

Pannell then filed an Amended and Restated Counter-Claim for Accounting and Contribution. In his amended counterclaim, Pannell asserted that it was not until June 3, 1997, that a Certificate of Limited Partnership was filed with the State and, therefore, the business operated as a general partnership up until that date. Pannell also claimed Investors, of which Long was the majority owner, was administratively dissolved from December 19, 1997, until September 17, 1999. According to Pannell, Investors was grossly undercapitalized and the sole purpose of that entity was to shield Long from any personal liability. Pannell further claimed that due to various improper actions by Long, such as failing to observe necessary requirements as an officer or agent of Investors, Long was liable for Investor's obligations to Volunteer Supply. The remaining allegations and request for relief in the amended counterclaim were the same as those contained in the original

---

[1] Although not relevant for purposes of this appeal, Investors and Ventures eventually were added as parties to the lawsuit.

counterclaim, except Pannell also requested a determination that Investors was a sham limited liability company and that Long was liable personally for any obligations of Investors. In both the original counterclaim and the amended counterclaim, no mention was made of any oral contract between Long and Pannell, or any claimed breach thereof. In response to the amended counterclaim, Long and Investors denied any liability or wrongdoing.

The two day non-jury trial began with Long's counsel reading a portion of Pannell's deposition into the record. In his deposition, Pannell identified a draft of the limited partnership agreement and a draft of the document setting forth the capital contributions to be made by the various partners. Pannell acknowledged capital contributions were not made in accordance with that document. The draft limited partnership agreement was the only document created to operate the limited partnership, and Pannell intended to operate the limited partnership in accordance with that document. According to the limited partnership agreement, general partners could not be required to contribute capital without unanimous consent. Pannell testified Ventures made a "capital call" on Investors. Investors, presumably acting through Long, did not agree to contribute any additional capital. Therefore, there was no unanimous consent.

After the above deposition testimony was read into the record, Long was called as the first live witness. Long identified a November 20, 2001, Certificate of Existence issued by the State of Tennessee indicating that Investors was an active limited liability company with an original qualification date of March 6, 1996. Long also identified the Certificate of Domestic Limited Partnership pertaining to Volunteer Supply which showed an effective date of June 3, 1997. The general partners shown on this Certificate are Investors and Ventures.

Long then identified a purchase agreement dated June 3, 1997, wherein Volunteer Supply purchased a beauty supply business located in Murfreesboro, Tennessee. The purchase price was $265,885, plus the assumption of over $50,000 in accounts payable. After paying $79,000 toward the purchase price, the remaining balance was financed by the sellers with Volunteer Supply being obligated to make monthly payments of $2,430.07 until January 15, 2003. Long and Pannell personally guaranteed this indebtedness.

Long testified a disagreement arose when Pannell wanted him to put more money into the partnership and he (i.e., Long) refused. In an effort to resolve their disagreement, the parties entered into an Agreement on August 27, 1999, and a subsequent undated amendment which Long claims settled all disputes between them. The Agreement specifically stated it was entered into "in order to solve and remedy disagreements" related to Volunteer Supply and contained two primary provisions.[2] One of the provisions addressed the business Volunteer Supply had purchased in Murfreesboro, with Long and Pannell each agreeing to place $100,000 into an interest bearing account to assure the availability of funds to pay off the balance of that loan. The loan eventually

---

[2] The Agreement was contingent on each party receiving $100,000 as an advance towards their lottery winnings. Neither party argues this contingency did not occur.

was paid off for $168,599.05, and the remaining $31,400.95 was divided equally between Long and Pannell.

The second provision in the Agreement concerned Long's potential purchase of Volunteer Supply's territory and assets located in Sweetwater, Tennessee. Long agreed to purchase the Sweetwater location for $90,000 and to use these funds to pay off the liabilities associated with that location. Long specifically reserved the option to sell and assign his right to purchase the Sweetwater territory to Brenda McLemore ("McLemore"). The purchase of the Sweetwater territory was conditioned upon written approval of the sale to Long "or McLemore" by State Service Systems, the franchisor. Long placed an additional $100,000 into the joint account apparently to secure his purchase of the Sweetwater territory for $90,000. However, neither the Agreement nor the amendment required Long to place this additional $100,000 into the account. Likewise, neither of these documents indicated what would happen to Long's additional $100,000 if he did not purchase that location. The amendment only discussed how Pannell's $100,000 and Long's $200,000 would be distributed if either party died. To make a very long story a little shorter, State Service Systems did not approve the sale to Long. The Sweetwater location then was sold to McLemore for $100,000. Long then told Pannell he wanted his remaining $100,000 from the joint account. Pannell refused to allow Long to withdraw these funds, resulting in Long's filing of the declaratory judgment action.

Long testified the Agreement conditioned the sale of the Sweetwater location upon State Service System actually approving the sale to him, even though the words "or McLemore" were used in the Agreement. Therefore, according to Long, this condition in the Agreement never came to pass since State Service System did not approve his purchase of the Sweetwater location.

Long identified a May 15, 2000, letter from Pannell. In that letter, Pannell informed Long he was in the process of dissolving Volunteer Supply, and as "you and I are the humans representing equal shares of the General Partners, I have allocated the Assets and Liabilities to you and me.…" Pannell then attached a balance sheet detailing the assets and outstanding liabilities as of December 31, 1999. When this letter was written, there was an outstanding balance of $163,132 on the loan on the Murfreesboro location. The amount of loans Pannell claims to have made to Volunteer Supply totaled $196,197. Excluding these two primary liabilities, after deducting all other liabilities from the total assets, the remainder of the balance sheet showed net assets of $36,408. Thus, according to this letter, the outstanding liabilities for Volunteer Supply totaled $322,921 ($163,132 + $196,197 - $36,408 = $322,921). Pannell demanded payment from Long of $161,460, which represented one-half of the outstanding liabilities. Long responded to the letter, refusing to pay any additional funds and further objecting to Pannell's unilaterally dissolving Volunteer Supply.

Long was cross-examined about some of the debts incurred prior to the Certificate of Domestic Limited Partnership for Volunteer Supply being issued on June 3, 1997. After Long was questioned about a couple of these debts, his attorney objected. The following discussion then took place:

-4-

[Counsel for Long]: Once again, Your honor, because of this rule about being silent and constituting an amendment, all these transactions are in advance of the issuance of the so-called birth certificate by the Secretary of State and are therefore irrelevant.

[Counsel for Pannell]: Well, I think they're highly relevant. I specifically stated in my amended counter-claim that it operated as a general partnership prior to [issuance of the Certificate] . . . .

[Counsel for Long]: I suggest what happened before the issuance of the limited partnership came into existence is irrelevant.

\* \* \*

[Counsel for Pannell]: I disagree, Your honor. I think partners have a right of contribution towards each other, and general partners are jointly and severally liable for debts chargeable to the partnership.

[Counsel for Long]: Absolutely to third parties, but not as to each other.

The Trial Court stated it would allow Pannell's counsel to continue with this line of questioning and they could decide its relevance at a later time. In response, Long's counsel stated he was "reserving my continuing objection so that the pleadings will not be deemed [amended]." The Trial Court then pointed out the Rules of Evidence do not provide for a "continuing" objection and an objection would have to be made each time if opposing counsel did not agree that it could be continuing in nature. In response, Pannell's attorney agreed the objection could be continuing so repeated objections did not have to be made.

Long testified he began participating in Volunteer Supply in 1995 and withdrew from the partnership in 1996. When he rejoined the partnership later in 1996, Pannell never told him he would have to contribute equally in order to come back into the partnership. Long stated he would have contributed equally if, at that time, he had had the funds to do so.[3] Long identified tax documents which indicated his profit-sharing percentage in the partnership before the Certificate of Domestic Limited Partnership became effective was 14%. His loss-sharing percentage was also 14%.

---

[3] Several years later, in January of 2000, Long received over one million dollars from his lottery winnings.

Pannell's testimony was the same as Long's with regard to the date the Certificate of Limited Domestic Partnership was issued for Volunteer Supply. Pannell also discussed Long's leaving the partnership in June of 1996 and returning in late August of that same year. According to Pannell, he and Long orally agreed that if Long was permitted to return, Long would contribute one-half of any necessary funds and bring the money in his capital account to a level equal with Pannell's. Pannell claims Long agreed to these terms in an "individual" capacity. Pannell did, however, acknowledge Long commented that if he did not have any money he could not contribute. In response, Pannell allegedly told Long:

> Well, I understand; that, you know, for instance, if we need money in December and I have it and you don't, I'll put it in. But in February when we get lottery payments, you can put it in then.…

In other words, Pannell claimed "it wasn't an issue of whether he would never have it, but the timing of when he might have it. And I said that was fine."

Pannell discussed the various debts which were incurred by the general partnership prior to its becoming a limited partnership on June 3, 1997. He also testified how he paid many of these debts. Any debts Pannell paid after 1999 were paid personally. With regard to debts paid prior to 1999, Pannell would loan money to the partnership, which in turn would use that money to pay the debt. During Pannell's testimony about debts he paid personally, the Trial Court inquired as to whether Pannell was a party to the lawsuit in his individual capacity. Pannell's counsel stated that he was. The following dialogue then took place:

> [Counsel for Long]: I want to make sure that I understand that there is a – that he's claiming that he is entitled to sue him for contribution for debts that he paid of the limited partnership. That ain't the law. I object to relevance.
>
> The Court: Okay.
>
> [Counsel for Long]: May it be a continuing objection?
>
> The Court: Yes. I am going to overrule it at this time, and then we can argue that.

According to Pannell, there was a total of $91,018 in debts incurred prior to the limited partnership becoming effective which he paid personally. There were an additional $47,000 in debts incurred prior to the effective date of the limited partnership which were paid directly from loans made by Pannell to the partnership.

Pannell testified that when Long came back into the partnership in 1996, the oral agreement "for moving ahead was that we would share equally in putting in money that was

-6-

necessary … even prior to that our setup was to equally contribute." Excluding the loans he made to the partnership, Pannell claimed to have paid debts and/or assumed debts totaling $183,690 during the life of the Volunteer Supply.[4] When questioned about any income he received from the partnership, Pannell stated at some point in 1996 he and Long were paid a salary or draw, but they both put all of this money back into the partnership. When their accountant told them they were being "silly," this procedure stopped. After that, "[we] never did pay ourselves anything."

When asked about the alleged settlement Agreement, Pannell testified he and Long did attempt to settle their dispute. With regard to the Sweetwater location, Pannell claimed the Agreement required Long to pay him $90,000 regardless of whether Long purchased that location himself or whether he purchased McLemore's loan if it was sold to her. However, as things turned out the sale of the Sweetwater location to Long never was approved. When that location later was purchased by McLemore, Long refused to purchase McLemore's note and pay Pannell $90,000. Pannell contends, therefore, that this part of the Agreement never was carried out by Long.

Pannell summarized his request for damages as follows:

> I have put in $211,117 more in capital than he has. I have put in $137,804 in loans more than he has; and I have paid and/or assumed liabilities of the partnership of $183,690 that he has not, for a total of $532,611 in excess of Mr. Long. I would ask that he keeps his commitment and pay half of that, which would be $266,306.

After closing arguments were completed, the Trial Court issued some preliminary findings. The Trial Court concluded Long was entitled to the $100,000 which he placed into the joint account. As to liability for partnership debts, the Trial Court concluded Long was a general partner and was liable as such from the beginning of the partnership up until the Certificate of Domestic Limited Partnership was filed on June 3, 1997. The Trial Court also determined that any debt incurred prior to June 3, 1997, which was paid either by Pannell personally or through loans he made to the partnership was still to be considered "partnership debt" for which Long shared responsibility. After Long's counsel expressed considerable but respectful disagreement over the propriety of this ruling, the Trial Court allowed Long thirty days to file a brief explaining why this ruling was incorrect. Thereafter, Long's counsel suggested opposing counsel submit to him a list of debts which Pannell claimed should be paid in accordance with the Court's ruling, and if an agreement could not be reached, the parties could return to court for a further ruling. The Trial Court agreed with this suggestion.

The next issue addressed by the Trial Court was Pannell's argument that based on the alleged oral agreement made by Long to contribute one-half to the partnership, Long was liable for

---

[4] This sum does not include the loan on the Murfreesboro property which the parties paid off in equal amounts.

a full one-half of all partnership debt, regardless of whether it was incurred before or after June 3, 1997. The following discussion then took place:

> The Court: But you're not suing upon an agreement[.]
>
> Counsel for Pannell: Well, I sued for contribution. I didn't specifically put in my complaint, set forth that there was a contribution agreement.
>
> The Court: Yeah. And I didn't think you had, so I didn't consider it in terms of is this a binding agreement, offer, acceptance, consideration, and so forth.
>
> Counsel for Pannell: And I think there was clearly a meeting of the minds, if you look at … Long's testimony as to, yeah, I said that. But I said that if and when I got the money – he said "if I had the money," if I remember correctly. And he did get the money in January, and I think there was a meeting in … [Pannell's] mind that they contributed equally and that they were basically equal people in this thing despite the setup.

For all intents and purposes, the trial ended with the above discussion. The Trial Court issued its final judgment on July 12, 2002, approximately 7 ½ months later. The reason for the delay was the continuing disagreement between the parties as to what should be considered as partnership debt incurred prior to June 3, 1997, and the resulting need for an additional court hearing to resolve the disagreement. In its final judgment, the Trial Court noted that after its initial rulings were made at the end of the trial, it was presented with conflicting orders and there was further consideration by the Court and additional arguments of the parties. As relevant to this appeal, the Trial Court's final judgment awarded Long the $100,000 in the joint account plus any accrued interest. The Trial Court also ruled the total amount of partnership debt incurred prior to June 3, 1997, was $138,018, and Long was liable for fourteen percent (14%) of this amount, or $19,322.52.[5] Finally, the Trial Court concluded that from and after June 3, 1997, the parties dealt with each other through their respective limited liability companies and as limited partners, and Long, as a limited partner, was not liable for any further debts.

Based on the Trial Court's express findings, there are two other findings which are necessarily implied. These are: 1) The Agreement and subsequent amendment thereto did not constitute an accord and satisfaction barring Pannell's counterclaim for contribution; and 2) Pannell

---

[5] As set forth *supra*, Long presented proof that his profit and loss sharing percentage in the partnership prior to June 3, 1997, was fourteen percent. The Trial Court accepted this proof when it concluded Long was liable for fourteen percent of the pre-June 3, 1997 debts.

could not recover for breach of the alleged oral promise by Long to pay one-half of the partnership's debts and expenses because Pannell's counterclaim and restated counterclaim could not be interpreted as alleging a breach of contract claim.

On appeal, Pannell raises two issues, which we quote:

I.      Whether the Trial Court erred by failing to enforce the contribution agreement between the parties on the basis that it had not been specifically pled?

II.     Whether a Court should grant the prevailing party relief, not specifically claimed in his pleadings when the basis for that relief is specifically claimed, actually litigated, and proven at trial?

Long also appeals, claiming the Trial Court erred in not holding there was an accord and satisfaction between the parties. The second issue raised by Long challenges the amount of damages awarded to Pannell.

## Discussion

The factual findings of a trial court are accorded a presumption of correctness, and we will not overturn those factual findings unless the evidence preponderates against them. *See* Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). With respect to legal issues, our review is conducted "under a pure *de novo* standard of review, according no deference to the conclusions of law made by the lower courts." *Southern Constructors, Inc. v. Loudon County Bd. Of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

We first will discuss Pannell's argument that the language in his counterclaim and restated counterclaim were broad enough to encompass a cause of action for breach of contract. Pannell bases his argument on the following portions of Tenn. R. Civ. P. 8:

**Rule 8.01 Claims for Relief. –** A pleading which sets forth a claim for relief, whether an original claim, counterclaim, cross-claim, or third-party claim, shall contain (1) a short and plain statement of the claim showing that the pleader is entitled to relief; and (2) a demand for judgment for the relief the pleader seeks. Relief in the alternative or of several different types may be demanded.

* * * *

**Rule 8.05. Pleading to Be Concise and Direct – Statutes, Ordinances and Regulations – Consistency. –** (1) Each averment

of a pleading shall be simple, concise and direct.  No technical forms
of pleading or motions are required. . . .

**Rule 8.06 Construction of Pleadings. –**  All pleadings shall
be so construed as to do substantial justice.

Relying on *Paduch v. City of Johnson City*, 896 S.W.2d 767 (Tenn. 1995), Pannell
argues the common-law rule that pleadings be construed against the drafter has been abolished in
this State, and "Rule 8.06 substitutes the end to be sought in place of specific rules of construction."
*Id*. at 769.  We agree this is the goal of Rule 8.06.  However, while a complaint need not contain "in
minute detail" the facts giving rise to the claim, it nevertheless must contain allegations "from which
an inference may fairly be drawn that evidence on these material points will be introduced at trial."
*Trau-Med of America, Inc. v. Allstate Insurance Co.*, 71 S.W.3d 691, 704 (Tenn. 2002).

We have carefully reviewed Pannell's counterclaim and restated counterclaim.
Nowhere in these documents is an oral agreement mentioned, much less a claim for breach of such
an agreement.  It is for this reason the Trial Court specifically stated it had not evaluated the evidence
from a standpoint of whether a breach of contract claim had been proven.  The Trial Court simply
could not glean a breach of contract allegation from the counterclaim and restated counterclaim.
Neither can we.  In our opinion, the only reasonable interpretation of the counterclaim and restated
counterclaim is that Pannell is making a claim for contribution pursuant to applicable law governing
liability of partners for partnership debt.  "[T]here is no duty on the part of the court to create a claim
that the pleader does not spell out in his complaint."  *Trau-Med*, 71 S.W.3d at 704 (citations
omitted).  If we were to conclude the counterclaim or restated counterclaim alleged a claim for
breach of contract, we would be doing just that.  We find no reversible error in the Trial Court's
refusal to interpret the counterclaim and restated counterclaim as alleging a claim based on breach
of contract.

Pannell's second issue is that the Trial Court erred by not concluding that a breach
of contract claim had been tried by implied consent.  In *McLemore v. Powell*, 968 S.W.2d 799, 803
(Tenn. Ct. App. 1997) this Court explained:

Generally speaking, trial by implied consent will be found
when the party opposed to the amendment knew or reasonably should
have known of the evidence relating to the new issue, did not object
to this evidence, and was not prejudiced thereby.  *Id.*  As the
Tennessee Supreme Court stated in *Zack Cheek Builders, Inc. v.
McLeod*[, 597 S.W.2d 888, 891 (Tenn. 1980)]:

"Implied consent ... is much more difficult to establish (than
express consent) and seems to depend on whether the parties
recognized that an issue not presented by the pleadings

-10-

entered the case at trial. A party who *knowingly acquiesces* in the introduction of evidence relating to issues that are beyond the pleadings is in no position to contest a motion to conform. Thus, consent generally is found when evidence is introduced *without objection*, or when the party opposing the motion to amend himself produced evidence bearing on the new issue."

Id. (quoting 6 Wright & Miller, *Federal Practice and Procedure* § 1493, at 462-63 (1971)). Trial by implied consent is not shown by the presentation of evidence that is relevant to an unestablished issue when that evidence is also relevant to the established issue. *Hiller v. Hailey*, 915 S.W.2d 800, 805 (Tenn. App.1995) (citations omitted).

*McLemore v. Powell*, 968 S.W.2d 799, 803 (Tenn. Ct. App. 1997)(emphasis added). The Trial Court's determination with respect to the issue of implied consent "must be upheld unless there has been an abuse of discretion." *Hobbs v. Hobbs*, 987 S.W.2d 844, 847 (Tenn. Ct. App. 1998), *cert. denied*, 526 U.S. 1075, *reh'g denied*, 526 U.S. 1167 (1999).

In our resolving this issue, Pannell's biggest obstacle is the fact that the Trial Court never was asked to determine whether the breach of contract claim was tried by implied consent. It is impossible to determine that the Trial Court abused its discretion when it never had the opportunity to exercise that discretion in the first place. The Trial Court is in a better position than this Court to make the initial determination of whether an issue was tried by implied consent. Because it never became an issue before the Trial Court, Long's counsel never was given an opportunity to argue to the Trial Court reasons why there was no trial by implied consent. It is apparent that the Trial Court is the proper forum to raise initially this issue, and this is a perfect example of why, as a general rule, this Court is disinclined to consider issues which are raised for the first time on appeal. *See, e.g., In re Adoption of D.P.M.*, 90 S.W.3d 263, 267 (Tenn. Ct. App. 2002). As the Trial Court never was asked to exercise its discretion by making a determination, with respect to the issue of trial by implied consent, the Trial Court made no such determination. Since the Trial Court was not asked to make such a determination, and, therefore, made no such determination, there could be no abuse of discretion by the Trial Court as to this issue. *See Hobbs*, 987 S.W.2d at 847.

Even if we could find that the issue of trial by implied consent had been raised before and denied by the Trial Court, it is important to note that Long objected to the introduction of any evidence pertaining to debt incurred prior to June 3, 1997, and to *anything* which took place before the limited partnership came into existence. Long's counsel went so far as to request that his objection be considered "continuing" so the pleadings would not be deemed amended. Although these objections were overruled for the most part, we do not believe there is any way Long legitimately could be regarded as having "knowingly acquiesce[d]" in the introduction of evidence relating to the breach of contract issue. *McLemore*, 968 S.W.2d at 803. In short, we conclude

-11-

Pannell has failed to demonstrate that his breach of contract claim was tried by implied consent, and certainly has failed to show any abuse of discretion by the Trial Court with respect to the issue of trial by implied consent.

As to Long's issues, Long first contends the Trial Court erred by not dismissing Pannell's counterclaim since there was an accord and satisfaction arising from the Agreement and amendment thereto. In *Lindsey v. Lindsey*, 930 S.W.2d 553 (Tenn. Ct. App. 1996), this Court discussed the controlling principles of law with respect to accord and satisfaction as follows:

> An accord is an agreement whereby:
>
> > One of the parties undertakes to give or perform, and the other to accept in satisfaction of a claim, liquidated or in dispute, and arising either from contract or from tort, something other than or different from what he is or considers himself entitled to; and a satisfaction is the execution of such agreement....
> >
> > To constitute a valid accord and satisfaction it is also essential that what is given or agreed to be performed shall be offered as a satisfaction and extinction of the original demand; that the debtor shall intend it as a satisfaction of such obligation, and that such intention shall be made known to the creditor in some unmistakable manner. It is equally essential that the creditor shall have accepted it with the intention that it should operate as a satisfaction .... The intention of the parties, which is of course controlling must be determined from all the circumstances attending the transaction.

*Lindsey*, 930 S.W.2d at 556-557 (quoting *R.J. Betterton Mgmt. Serv. v. Whittemore*, 733 S.W.2d 880, 882 (Tenn. Ct. App. 1987)).

Long testified that one of the conditions in the Agreement was not met because his purchase of the Sweetwater location never was approved by State Service Systems. Pannell testified, based on his understanding of the Agreement, that Long was required to pay him $90,000 for the Sweetwater location, either by purchasing that location himself or, if it was sold to McLemore, purchasing McLemore's note for $90,000. Pannell further testified this never happened. Pannell claims payment of the $90,000 was a condition in the Agreement which was not met and, therefore, there was no accord and satisfaction. Based on the testimony of both Long and Pannell, it appears they agree that various, although different, conditions in the Agreement were not met. Therefore, even though the Trial Court did not state why there was no accord and satisfaction, we conclude the preponderance of the evidence certainly does not weigh against this implied finding by the Trial Court.

The remaining issues on appeal center around the amount of the judgment awarded to Pannell. Specifically, Long claims the Trial Court erred when it concluded the pre-June 3, 1997 debts later paid by Pannell through loans he made to the partnership were "partnership debts." Long claims these debts should not be considered partnership debts because Pannell received a favorable tax deduction when he paid them down via a loan to the partnership. Long also claims since the partnership technically paid off $47,000 worth of debt, this amount should not be counted.

The uncontradicted trial testimony was that Pannell personally paid $91,018 in pre-June 3, 1997 debt, and another $47,000 was paid through loans Pannell made directly to the partnership. The fact remains that any of this pre-June 3, 1997, debt that was paid was paid by Pannell. That some of these debts were paid via a loan to the partnership which, in turn, paid the debt does not change this critical point. After considering all of the proof presented at trial, we conclude the preponderance of the evidence does not weight against the Trial Court's findings leading to its conclusion regarding which debts, and their amounts, appropriately were classified as pre-June 3, 1997, partnership debts for which Long shared responsibility. We find no error by the Trial Court on this issue.

## Conclusion

The judgment of the Chancery Court is affirmed, and this cause is remanded to the Chancery Court for such further proceedings as may be required, if any, consistent with this Opinion, and for collection of the costs below. The costs on appeal are assessed one-half against the Appellant T. Allen Pannell, Jr., and his surety, and one-half against the Appellee Doug Long.

_____
D. MICHAEL SWINEY, JUDGE

-13-